**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN THE MATTER OF THE TAX
LIABILITIES OF:

JOHN DOES, United States taxpayers who, at any
time during the years ended December 31, 2014,
through December 31, 2023, used the services of
the Trident Trust Group, including its predecessors,
subsidiaries, divisions, affiliates, and associates to
establish, maintain, operate, or control any foreign
financial account or other foreign asset; any foreign
corporation, company, trust, foundation or other
legal entity; or any foreign or domestic financial
account or other asset in the name of such foreign
entity.

No. 24 Misc. 594

---

## MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES OF AMERICA'S EX PARTE PETITION FOR LEAVE TO SERVE JOHN DOE SUMMONSES

EDWARD Y. KIM
Acting United States Attorney
Southern District of New York
*Attorney for Petitioner*
*United States of America*
86 Chambers Street, Third Floor
New York, New York 10007
Tel: (212) 637-2810

ANTHONY J. SUN
Assistant United States Attorney
    – Of Counsel –

# TABLE OF CONTENTS

**PAGE(s)**

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND .........................................................................................................................3

I.     U.S. Taxpayers Must Report Foreign Income and Disclose Foreign Financial Accounts and Entities.....................................................................................................................3

II.    Offshore Tax Evasion ........................................................................................................4

III.   The TT-Group ....................................................................................................................7

      A.     The TT-Group Offers Services that Enable U.S. Clients to Conceal Assets...........7

      B.     Information from Other Sources Corroborates the IRS's Belief that U.S. Taxpayers Use the TT-Group to Evade U.S. Taxes.................................................10

IV.   The Summonses....................................................................................................................10

ARGUMENT ...............................................................................................................................14

I.     The Investigation Concerns an Ascertainable Class ...........................................................17

II.    There Is a Reasonable Basis to Believe that the John Doe Class May Have Failed to Comply with U.S. Internal Revenue Laws .......................................................................19

III.   The Information Sought About the Target Class, Including the Identities of the Class's Members, Is Not Readily Available from Other Sources ..................................................21

IV.   The Information Sought Is Narrowly Tailored to Information that Pertains to the Failure or Potential Failure of the John Doe Class to Comply with the Internal Revenue Laws ..23

CONCLUSION.............................................................................................................................28

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(s)**

*In re Tax Liabs. of John Does*,
    No. 2:10-mc-00130-MCE-EFB, 2011 WL 6302284 (E.D. Cal. Dec. 15, 2011) ............. 18

*In re Tax Liabs. of John Does*,
    No. 03-22793-CIV, 2003 WL 22953182 (S.D. Fla. Oct. 30, 2003) ......................... 18, 21

*In re Tax Liabs. of John Does*,
    No. 09-cv-00861-REB, Dkt. No. 4 (D. Colo. Apr. 15, 2009)............................ 18

*In re Tax Liabs. of John Does (Agric. Asset Mgmt. Co.)*,
    688 F.2d 144 (2d Cir. 1982)............................................................ 19

*In re Tax Liabs. of John Does (Am. Bankers Ins. Group)*,
    No. 03-cv-22793, 2003 WL 22953182 (S.D. Fla. Oct. 30, 2003) .................. 21

*In re Tax Liabs. of John Does (American Express)*,
    No. 00-cv-3919, 2000 WL 34538137 (S.D. Fla. Oct. 30, 2000) .................... 21

*In re Tax Liabs. of John Does (Butterfield Bank)*,
    No. 13-mc-377-P1, Dkt. No. 3 (S.D.N.Y. Nov. 12, 2013) ............................. 18

*In re Tax Liabs. of John Does (Columbus Trade Exch.)*,
    671 F.2d 977 (6th Cir. 1982) ........................................................... 20

*In re Tax Liabs. of John Does (HSBC Bank USA, N.A.)*,
    No. 11-cv-01686-PJH, Dkt. No. 10 (N.D. Cal. Apr. 7, 2011) ........................ 22

*In re Tax Liabs. of John Does (MasterCard Int'l)*,
    No. 02-22404-CIV, 2002 WL 32879613 (S.D. Fla. Aug. 20, 2002) ............... 22

*In re Tax Liabs. of John Does (Panama Offshore Legal Servs.)*,
    No. 21-mc-424, Dkt. No. 19 (S.D.N.Y. July 15, 2021) .................................. 18

*In re Tax Liabs. of John Does (Wegelin & Co.)*,
    No. 13-mc-00021-P1, Dkt. No. 4 (S.D.N.Y. Jan. 29, 2013)............................ 18

*In re Tax Liabs. of John Does (Zurcher Kantonalbank (ZKB))*,
    No. 13-mc-378-P1, Dkt. No. 3 (S.D.N.Y. Nov. 7, 2013) ..................................18

*Mensh v. United States*,
    No. 08 Civ. 4162 (DLI) (ALC), 2009 WL 2242295 (E.D.N.Y. Jul. 27, 2009) ............... 17

*PAA Mgmt., Ltd. v. United States,*
    962 F.2d 212 (2d Cir. 1992) ............................................................. 15

*Sergeeva v. Tripleton Int'l Ltd.,*
    834 F.3d 1194 (11th Cir. 2016) ........................................................ 14

*Tiffany Fine Arts, Inc. v. United States,*
    469 U.S. 310 (1985) ......................................................................... 19

*United States v. Arthur Young & Co.,*
    465 U.S. 805 (1984) ......................................................................... 15

*United States v. Bisceglia,*
    420 U.S. 141 (1975) ......................................................................... 15

*United States v. Davey,*
    543 F.3d 996 (2d Cir. 1976) ............................................................. 24

*United States v. Euge,*
    444 U.S. 707 (1980) ......................................................................... 15

*United States v. Pittsburgh Trade Exch., Inc.,*
    644 F.2d 302 (3d Cir. 1981) ............................................................. 20

*United States v. Powell,*
    379 U.S. 48 (1964) ........................................................................... 24

*United States v. Ritchie,*
    15 F.3d 592 (6th Cir. 1994) ............................................................. 21

*United States v. White,*
    853 F.2d 107 (2d Cir. 1988) ............................................................. 24

**STATUTES**

26 U.S.C. § 61 .......................................................................................... 3

26 U.S.C. § 6012 ...................................................................................... 3

26 U.S.C. § 6038 ...................................................................................... 9

26 U.S.C. § 6038D .................................................................................... 4

26 U.S.C. § 6039F .................................................................................... 4

26 U.S.C. § 7601(a) ................................................................................ 14

26 U.S.C. § 7609(f)................................................................................ *passim*

26 U.S.C. § 7609(f)(1) ...................................................................... 19, 23

26 U.S.C. § 7609(f)(3) ............................................................................. 23

26 U.S.C. § 7609(h)(1) ............................................................................ 16

31 U.S.C. § 5314 ....................................................................................... 4

## REGULATIONS

26 C.F.R. § 1.6038-2(a) ....................................................................... 4, 9

31 C.F.R. § 1010.350 ................................................................................ 4

## OTHER AUTHORITIES

H.R. Rep. No. 94-658 (1975)................................................................. 19

H.R. Rep No. 116-39 (2019)...................................................................23

*Interest and Ordinary Dividends (2023), Part III,*
    https://www.irs.gov/pub/irs-prior/f1040sb--2023.pdf ........................4

*U.S. Congress, Joint Committee on Taxation,*
    *Description of H.R. 1957, the "Taxpayer First Act of 2019"* (2019),
    https://www.jct.gov/publications/2019/jcx-15-19/ ............................24

The United States of America (the "Government"), on behalf of the Internal Revenue Service ("IRS"), by its attorney, Edward Y. Kim, Acting United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its *ex parte* petition for leave to serve twelve "John Doe" summonses (the "Petition") seeking information from various entities located in this District relating to U.S. taxpayers who used the services of the Trident Trust Group to evade their federal taxes by concealing assets and taxable income in offshore tax havens.

## PRELIMINARY STATEMENT

The IRS has long been concerned with U.S. taxpayers who evade their federal tax obligations by concealing taxable income in offshore tax havens or jurisdictions that provide for financial secrecy. Some taxpayers use offshore service providers to conceal assets, often by creating offshore entities, such as trusts, foundations, and corporations, and opening foreign financial accounts. One such group of offshore service providers is the Trident Trust Group ("TT-Group"), a multinational group of companies that operate under the common business name "Trident." TT-Group entities can be found in nearly thirty countries, including nearly every major tax haven in the world. Through voluntary disclosure programs and other investigations, the IRS has identified several clients of the TT-Group who appear to have used its services to unlawfully evade U.S. taxes, including creating offshore entities and accounts in tax haven jurisdictions that conceal the U.S. taxpayer's income. Some of the services offered by TT-Group bear the hallmarks of enabling unlawful tax evasion, including providing nominee directors, officers and trustees for offshore entities and mail retention services for offshore accounts that avoid creating a domestic paper trail.

Through this Petition, the IRS seeks to obtain a more comprehensive list of the TT-Group's clients so that it can ascertain whether any of them owe additional U.S. taxes.

As used herein and in the attached Declaration of Randy Hooczko ("Hooczko Declaration"), the TT-Group includes entities in almost thirty jurisdictions, including five entities in the United States. *See* Hooczko Declaration Appx. A. The IRS is seeking to identify the following class of persons, all of whom are TT-Group clients:

> U.S. taxpayers who, at any time during the years ended December 31, 2014, through December 31, 2023, used the services of the Trident Trust Group ("TT-Group") to establish, maintain, operate, or control: any foreign financial account or other foreign asset; any foreign corporation, company, trust, foundation, or other legal entity; or any foreign or domestic financial account or other asset in the name of such foreign entity.

Hooczko Declaration ¶ 6. As part of its investigation, the IRS seeks to trace electronic fund transfers and courier deliveries between the TT-Group and its clients, to identify the TT-Group's U.S. taxpayer clients who have failed to comply with their U.S. tax obligations.

The IRS does not know the identity of the TT-Group's U.S. clients, so it cannot summons those clients directly, nor can it generally summons TT-Group entities without a U.S. presence. Thus, to obtain the identities of TT-Group's clients and records of their transactions with TT-Group, the United States brings this *ex parte* proceeding under 26 U.S.C. § 7609(f) and (h) for leave to serve John Doe summonses (collectively, the "Summonses") on four groups of entities based in this district: (1) courier services believed to have records relating to shipments between TT-Group and its U.S. clients; (2) financial institutions believed to have records of electronic funds transfers relating to U.S. clients of the TT-Group; (3) U.S. banks that maintain correspondent accounts for foreign banks used by the TT-Group; and (4) an affiliated entity (Nevis Services

Limited)[1]—all of which are expected to have records of transactions to help identify the TT-Group's U.S. clients.

In addition, concurrent with this Petition, the United States is filing petitions in the U.S. District Courts for the Northern District of Georgia and the District of South Dakota, to serve John Doe summonses on the TT-Group entities based in those districts, seeking information regarding the same class of clients. *See* Hooczko Decl. ¶ 8 (list of summonsed entities).

The issuance of the Summonses is warranted because, as described in detail below, (i) they relate to the investigation of an ascertainable group or class of persons, namely, U.S. taxpayers who used the TT-Group's services; (ii) there is a reasonable basis for believing these U.S. taxpayers may fail or may have failed to comply with U.S. internal revenue laws; and (iii) information sufficient to establish these U.S. taxpayers' identities is not readily available to the IRS from other sources. *See* 26 U.S.C. § 7609(f). In addition, the IRS is permitted to issue the Summonses because the information sought is narrowly tailored to pertain to the failure (or potential failure) of U.S. taxpayer-clients of the TT-Group to comply with internal revenue laws. *Id.*

## BACKGROUND

### I.    U.S. Taxpayers Must Report Foreign Income and Disclose Foreign Financial Accounts and Entities

United States citizens, resident aliens, and trusts with gross annual income above the reporting threshold must file income tax returns each year reporting their income from all sources worldwide. 26 U.S.C. §§ 61, 6012. These individuals and trusts (referred to throughout this Memorandum as "U.S. taxpayers") must also disclose to the Government their ownership interests

---

[1] Nevis Services Limited is a New York corporation functioning as a liaison and marketing affiliate of Morning Star Holdings Limited (later TT-Nevis). Hooczko Decl. ¶ 72.

in certain foreign assets. For example, those who have financial interests in, or signature authority over, foreign financial accounts must disclose this on Schedule B of their income tax return. *See* 26 U.S.C. § 6038D; *see also* IRS, Form 1040, Schedule B, *Interest and Ordinary Dividends (2023)*, Part III, https://www.irs.gov/pub/irs-prior/f1040sb--2023.pdf. U.S. taxpayers are also required to report their financial interests in foreign financial accounts on a Report of Foreign Bank and Financial Accounts, FinCEN Form 114 (the "FBAR"),[2] when the aggregate value of those accounts exceeds $10,000 at any time during any calendar year. 31 U.S.C. § 5314; 31 C.F.R. § 1010.350. U.S. taxpayers are further required to report certain transactions with foreign persons or trusts, *see* 26 U.S.C. §§ 6039F, 6048, and their ownership of or control over foreign corporations, *see id.* § 6038; 26 C.F.R. § 1.6038-2(a).

## II.    Offshore Tax Evasion

U.S. taxpayers unlawfully seeking to evade their tax obligations sometimes conceal unreported taxable income in accounts in offshore no-tax, low-tax, or financial secrecy jurisdictions. Hooczko Decl. ¶ 11. Often, taxpayers rely on offshore service providers to create foreign entities to conceal their income, and to provide directors, officers, and trustees who act as such in name only to conceal the U.S. taxpayers' beneficial ownership of assets. *Id.* ¶¶ 35–38. Offshore service providers may also assist taxpayers in opening foreign financial accounts. *Id.* By using the services of offshore service providers, taxpayers may claim they have no legal connection to foreign assets or entities, while retaining actual control through means such as side agreements with the service providers. *Id.* ¶ 38. The TT-Group is one such provider—its entities have appeared as a related service provider in several of the IRS's investigations into abusive offshore arrangements over more than a decade. *Id.* ¶¶ 132–85 (describing specific examples from

---

[2] Prior to 2014, the FBAR form was Form TD F 90-22.1.

voluntary disclosure and streamlined FBAR programs). The Hooczko Declaration explains in detail how seven U.S. taxpayers concealed offshore assets in part by using the services of TT-Group. *Id.* As an example, one taxpayer concealed his business and investment income in nine "master" accounts in Switzerland (with twenty-six sub-accounts) and three Polish accounts. *Id.* ¶¶ 146–49. Of these twelve accounts, the taxpayer used TT-Group entities to create or maintain six Swiss accounts and one Polish account. *Id.* The taxpayer and his spouse used TCS-Switzerland to conceal these accounts in three British Virgin Island "International Business Companies" of which they were the directors and beneficial owners. *Id.* ¶ 146–50. The IRS was not aware of the taxpayer's offshore arrangement until he and his spouse disclosed the arrangement in a 2010 voluntary disclosure, which only covered 2003 to 2008. *Id.* ¶ 151–52. This disclosure is just one of five detailed in the Hooczko Declaration, all of which include offshore arrangements, aided by TT-Group entities, the IRS was not aware of prior to the taxpayers' voluntary disclosures. *Id.* ¶ 132–81.

The IRS is concerned that the seven taxpayers' actions detailed in the Hooczko Declaration represent how other TT-Group clients use the group's services to aid their tax evasion. TT-Group is a large and established provider of offshore services. It is a network of entities operating in nearly thirty countries worldwide, including in several well-known tax havens across the world. *Id.* ¶¶ 63, 72, 84; *see also id.* Appx. A. Domestically, its entities have offices in at least five states: Georgia, South Dakota, New York, Florida, and Texas. *Id.* ¶ 65. The TT-Group is privately owned and has been providing corporate, trust, and fund administration services for over forty years. *Id.* ¶ 64.

Information available to the IRS shows that the TT-Group assists its U.S. clients in establishing offshore structures that aid the clients' tax evasion. *See id.* ¶¶ 135–80 (providing

specific examples of tax non-compliance by TT-Group clients). The TT-Group advertises these services and specifically describes them as means to enable its clients to keep beneficial ownership information confidential, avoid public reporting, and avoid registering entities, with express references to "suitable solutions" for "tax and estate planning." *Id.* ¶¶ 85, 109, 121. These services include the creation of offshore foundations managed by nominee officers; anonymous corporations secretly owned through bearer shares; and other arrangements that conceal U.S. clients' beneficial ownership of foreign assets, such as financial accounts, in foreign jurisdictions with strong financial secrecy laws and practices. *See id.* ¶¶ 84–131. For example, three people working for or on behalf of the TT-Group are listed as the founders, collectively, of 3,845 companies in Panama. *Id.* ¶ 101. This indicates the clients are using those TT-Group employees' names to conceal the true founders and beneficial owners of those companies, and information available to the IRS suggests that at least some of the true founders are U.S. taxpayers who are using the companies to conceal assets or income from the IRS. *Id.*

Taxpayers with offshore financial accounts often access their funds through correspondent accounts at U.S. banks. *Id.* ¶¶ 53–56. When foreign financial institutions maintain correspondent accounts at U.S. banks, their clients can access certain of the U.S. banks' services. *Id.* ¶ 54. Domestic owners of offshore accounts can use U.S.-based correspondent accounts to facilitate transactions denominated in U.S. dollars and transfer funds to and from their offshore accounts. *Id.* ¶ 55. This exploitation of correspondent banking relationships may enable tax evasion by facilitating the transfer of funds offshore. *Id.* ¶ 54. The IRS has encountered numerous examples of TT-Group entities helping U.S. taxpayers create foreign corporations and trusts, and open foreign bank accounts, all of which were concealed by their clients from the IRS. For instance, the TT-Group helped one U.S. taxpayer who had Russian and Swiss accounts in his own name to

create a corporation based in the British Virgin Islands, open new Swiss and Cypriot bank accounts in the name of the BVI corporation, and transfer assets from the Russian and Swiss accounts into the new ones that were not associated with his name. *Id.* ¶¶ 153–64. The taxpayer concealed these assets and accounts from the IRS by using the TT-Group's services. *Id.*

Additionally, the TT-Group uses wire transfers to send and receive payments. *See id.* ¶¶ 236–44. Uncovering to and from whom these wire transfers were sent will aid the IRS in determining which U.S. taxpayers have used the TT-Group's services to avoid U.S. taxation. *Id.*

The TT-Group also uses courier services to send and receive documents and payments from clients or other affiliates. *See id.* ¶¶ 230–34. Accordingly, records from these companies will further the IRS's current investigation. *Id.*

Accordingly, through this Petition, the IRS also seeks to summons several financial institutions (correspondent banks), wire transfer servicers, and courier services that it believes hold data relevant to the current investigation.

## III.    The TT-Group

### A.    The TT-Group Offers Services that Enable U.S. Clients to Conceal Assets

Some U.S. clients use the services provided by the TT-Group to conceal assets and avoid paying U.S. taxes. Specifically, the TT-Group offers services that enable offshore account and entity concealment, including mail forwarding and retention, and so-called "shelf companies." *Id.* ¶¶ 73–119.

***Offshore account and entity concealment.*** The TT-Group provides services that allow clients subject to U.S. tax laws to conceal their ownership of foreign entities and accounts by assisting them in forming offshore companies, including by providing registered agents, directors, nominee shareholders, and bank signatories for such companies. *Id.* ¶¶ 85–121. U.S. taxpayers concealing their beneficial ownership in accounts and other assets by registering these assets in

foreign jurisdictions that have strong financial secrecy laws and practices use TT-Group entity addresses for registration and mail purposes. *Id.* ¶¶ 104–06. The TT-Group also provides services that assist U.S. taxpayers in obfuscating their ownership of assets by creating anonymous offshore corporations and foundations used for asset concealment, as well as providing professional trustees, corporate directors (including resident individual directors), nominee shareholders, and nominee members for these offshore entities. *Id.* ¶ 100–02. The TT-Group entities also sometimes act as corporate secretaries and bank signatories for their clients' entities, which help conceal clients' identities and their beneficial ownership or control over accounts. *Id.* ¶ 100.

By way of example, Revenue Agent Hooczko's research showed that TT-Panama lawyers Martha Salazar and Samantha Federico and TT-UK accountant Sandra Dixon are associated with an unusually large number of Panamanian entities. *Id.* ¶ 101. As of July 17, 2024, Salazar was listed as a founder of 2,039 Panamanian companies, a director of 32, an officer of 23, and was otherwise linked to 152 other Panamanian entities, for a total of 2,246 such relationships. *Id.* Federico was listed as a founder of 838 Panamanian companies, a director of 55, an officer of 52, and was otherwise linked to 57 other Panamanian entities, for a total of 1,002 such relationships. *Id.* Similarly, as of July 17, 2024, Dixon was listed as a founder of 968 Panamanian companies, a director of 115, an officer of 112, and was otherwise linked to 97 other Panamanian entity relationships, for a total of 1,292 such relationships. *Id.* By providing TT-Group employees to serve as founders, nominee directors and officers, and in other corporate roles for Panamanian entities, the TT-Group assists the beneficial owners of those entities to conceal their identities. *Id.*

The TT-Group offers services to structure ownership through bearer shares or nominee shareholders. *Id.* ¶ 100–03. Bearer shares allow the identity of the true owners of a company to be left out of any records. *Id.* ¶ 42–43. This tactic limits TT-Group clients' on-paper involvement in

these foreign corporations. *Id.* Because U.S. taxpayers are required to disclose their interests in foreign corporations (*see, e.g.*, 26 U.S.C. § 6038; 26 C.F.R. § 1.6038-2(a)), the use of bearer shares can facilitate TT-Group clients' non-compliance with internal revenue laws by making it easy to avoid such reporting without detection. Hooczko Decl. ¶¶ 42–43.

Because TT-Group entities offer services that help U.S. taxpayers mask their involvement in offshore corporations, foundations, trusts, and beneficial ownership accounts, information about the identities of U.S. clients holding assets in these foreign corporations, foundations, or accounts is not readily available to the IRS. *Id.* ¶¶ 62.

*Mail forwarding and retention.* Mail forwarding and mail retention services also allow U.S. taxpayers to hide their assets from detection by avoiding the creation of a domestic paper trail. *Id.* ¶¶ 104–06. U.S. taxpayers are more easily able to deny their ownership of foreign accounts and corporations to U.S. taxing authorities when no relevant domestic records exist. *Id.* ¶¶ 44–45. The TT-Group offers clients these mail-related services for a fee. *Id.* ¶¶ 104–06. For example, the TT-Group can receive and distribute all correspondence addressed to a company, collect and process mail, and act as the designated recipient for legal correspondence on behalf of a business engaged in an international transaction in a jurisdiction where the client does not have a physical presence or address (i.e., agent for service or process). *Id.* Some TT-Group clients may also request that their account-related mail be destroyed. *Id.* Clients of U.S.-based TTC-SD can authorize the company, for a fee, to open, read, and hold their account-related *electronic* mail. *Id.* ¶ 104.

*Shelf companies.* Finally, the TT-Group offers its U.S. taxpayer clients the ability to create what are known as shelf companies—companies that are registered before any client's request, and then placed on a figurative shelf for "immediate delivery" to interested clients. *Id.* ¶ 112. In the IRS's experience, U.S. taxpayers use shelf companies to conceal their beneficial ownership of

assets by creating the false impression that the offshore shelf entity existed before the beneficial owner's involvement. *Id.*

### B. Information from Other Sources Corroborates the IRS's Belief that U.S. Taxpayers Use the TT-Group to Evade U.S. Taxes

Information obtained by the IRS from other enforcement efforts supports the IRS's belief that U.S. taxpayers have been using the TT-Group's services to avoid paying their U.S. taxes. Several U.S. taxpayers who filed voluntary disclosures to report to the IRS their prior non-compliance used the services of the TT-Group to avoid U.S. taxes. *Id.* ¶ 133–34. U.S. taxpayers using TT-Group services failed to report their offshore accounts, their ownership interest in offshore entities, and earnings from their offshore accounts to the IRS. *Id.*

The IRS has also obtained information regarding the TT-Group's offshore services through other John Doe summonses. For example, records the IRS obtained from a John Doe summons issued to the Wessell Group—a New York-based offshore service provider—indicate it sought the services of Morning Star (later merged to form TT-Nevis) and Nevis Services, to establish Nevis-based entities for its U.S. clients. *Id.* ¶¶ 93–95.

## IV.    The Summonses

To further its investigation, the IRS is seeking to issue the Summonses to obtain information that will allow it to identify U.S. taxpayer clients of the TT-Group who have not disclosed to the Government the existence of their offshore entities and accounts or who have failed to report related income to the IRS. *Id.* ¶¶ 6–7. Specifically, the IRS is seeking information regarding the following class of persons:

> United States taxpayers who, at any time during the years ended December 31, 2014, through December 31, 2023, used the services of the Trident Trust Group, including its predecessors, subsidiaries, divisions, affiliates, and associates to establish, maintain, operate, or control: any foreign financial account or other foreign asset; any foreign corporation, company, trust, foundation or other legal entity;

or any foreign or domestic financial account or other asset in the name of such foreign entity.

*Id.* ¶¶ 6, 175.

The IRS seeks in this action to summon relevant documents from four groups of record holders.[3] *First*, the IRS seeks shipping records from couriers that it believes made shipments to or from U.S. clients of the TT-Group: FedEx Corporation ("FedEx");[4] DHL Express (USA), Inc. ("DHL"); and United Parcel Service, Inc. ("UPS"). *See id.* Exs. B–D. The IRS believes that these couriers were used to make shipments between the TT-Group and its U.S. clients because the websites of several TT-Group entities encourage their clients to use courier services to send them documents; thus, those couriers very likely have records—unavailable elsewhere—that would assist the IRS in identifying TT-Group clients in the United States. *See, e.g.*, *id.* ¶ 230. Further, TT-Group and its clients have used several of these services, such as FedEx and DHL, to send documents in the past. *Id.* ¶¶ 93–94, 98. Although the TT-Group websites or other information available to the IRS do not specifically mention that UPS was used as a courier service by the TT-Group or its U.S. clients, Morning Star's *Fee Schedule for Nevis LLC Companies* webpage references the use of courier services, and UPS is a popular courier service. *See* Exhibit 5. Therefore, the Government has a reasonable basis for believing that UPS may have also been used as a courier service by the TT-Group or its U.S. clients. Because these couriers can search their records based on the name or address of a shipment's sender or recipient, they should be able to

---

[3] As mentioned above, simultaneously with the filing of this application, the Government is seeking leave from district courts in two other jurisdictions to serve summonses certain TT-Group entities located in those districts.

[4] The IRS also seeks records of the companies FedEx acquired during the summons period, including TNT USA Inc. and TNT Express (Canada) Ltd. Hooczko Decl. ¶ 226. TNT was acquired by FedEx in 2016, and thus FedEx should have records of these companies' shipments between U.S. persons and the TT-Group. *Id.* Accordingly, the IRS does not seek to serve a separate summons on these acquired companies.

identify instances in which their services were used to ship documents to or from the TT-Group or its associates where the address of either the shipper or recipient was in the United States. *Id.* ¶ 233. The records of these shipments—including specifically names, addresses, and phone numbers— will help the IRS identify U.S. taxpayers within the John Doe class. *Id.*

*Second*, the IRS seeks records from a financial institution and a clearing house that are believed to have records of electronic funds transfers relating to U.S. clients of the TT-Group: The Federal Reserve Bank of New York ("Federal Reserve NY") and The Clearing House Payments Company LLC ("Clearing House"). *See id.* Exs. E–F. The TT-Group advertises that it accepts payment from its clients by wire transfer, *id.* ¶ 238, and these two summonsed entities are expected to have records related to such transfers. Federal Reserve NY maintains the Fedwire Funds Service ("Fedwire"), which handles message transfer traffic initiating financial transactions between financial institutions, as well as the actual transfers of funds, and the instruction fields on those wire transfer documents likely contain information relating to cross-border funds transfers for which Fedwire handles the domestic segment. *Id.* ¶¶ 236–40. Clearing House operates the Clearing House Interbank Payment System ("CHIPS"), which is the main electronic funds transfer system for U.S. dollar transfers among international banks. *Id.* ¶¶ 241–44. It is likely that when U.S. clients send U.S. dollar-denominated funds to a TT-Group associate, CHIPS is used for the cross-border segment of the transfer. *Id.* ¶ 242. Fedwire and CHIPS handle only U.S.-based or U.S.-dollar-denominated transfers. *Id.* ¶¶ 236, 241. Records of wire transfers sent between the TT-Group and its U.S. clients via Fedwire and CHIPS will help the IRS to identify U.S. taxpayers who may have used the TT-Group's services for tax avoidance. *Id.* ¶¶ 238, 240, 242, 244.

*Third*, the IRS seeks records from U.S. banks that maintain correspondent accounts for foreign banks known to be used by the TT-Group. The U.S. banks to which the proposed

Summonses are directed are HSBC Bank USA, N.A. ("HSBC"); the Bank of New York Mellon Corporation ("BNY Mellon"); Wells Fargo Bank, N.A. ("Wells Fargo"); Citibank, N.A. ("Citibank"); UBS AG ("UBS"); Bank of America, N.A. ("Bank of America"); and Deutsche Bank Trust Company Americas ("Deutsche Bank") (collectively, the "U.S. Correspondent Banks"). *See id.* Exs. G–M. The IRS has learned that the TT-Group uses the services of certain banks in the Bahamas, Barbados, British Virgin Islands, Cayman Islands, Isle of Man, Jersey, Nevis, Panama, and Switzerland, each of which has correspondent accounts at one or more of the U.S. Correspondent Banks. *See, e.g.*, *id.* ¶¶ 122–30, 254, 257.

Because correspondent accounts are the principal means by which a foreign bank moves funds into and out of the United States, the IRS believes that summonsed records from these correspondent accounts will assist in identifying U.S. clients of the TT-Group. *Id.* ¶ 248. Additionally, the IRS seeks anti-money laundering records from the U.S. Correspondent Banks. Because correspondent accounts are associated with unlawful money laundering, U.S. laws and regulations require U.S. financial institutions that maintain correspondent accounts for foreign banks to implement certain risk-based procedures and controls reasonably designed to detect suspected money-laundering activity. *Id.* ¶¶ 251–52. The correspondent banks' anti-money laundering records may reveal aliases, pseudonyms, or nominees of U.S. taxpayers who have been using the TT-Group's services to facilitate U.S. tax evasion, as well as those persons' contact information. *Id.* ¶ 253.

*Fourth*, the IRS seeks certain information in aid of its investigation from a domestic entity affiliated with the TT-Group, Nevis Services Limited ("Nevis Services"), namely records relating to U.S. taxpayers who used the services of the TT-Group to establish, maintain, operate, or control foreign financial accounts, assets, or entities. *See id.* Ex. A. Nevis Services is a New York

corporation with its principal office in Manhattan. *Id.* ¶ 73. It acts as a liaison and marketing affiliate of Morning Star (one of the entities which TT-Group previously operated in Nevis, and which has since merged into TT-Nevis). *Id.* As a liaison for Morning Star, Nevis Services assisted TT-Group clients in establishing entities in Nevis. *Id.* The IRS has also learned that the Wessell Group, another service provider, contacted Morning Star and Nevis Services for assistance in establishing entities in Nevis for its U.S. clients. *Id.* ¶ 93. Because Nevis Services is a U.S. affiliate of the TT-Group, the IRS believes it will have records relevant and material to its investigation. And, although Nevis Services is a domestic entity, the IRS believes it can domestically access records of TT-Group entities in foreign jurisdictions without request as well. *See id.* ¶¶ 77–83; *see also, e.g.*, *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1200–02 (11th Cir. 2016) (holding that TCS-USA, a different domestic TT-Group entity, had access to records of foreign TT-Group entities and could thus be subpoenaed for them).

## ARGUMENT

The Court should approve the John Doe summonses, which are directed to various entities that may have information pertinent to the IRS's investigation of TT-Group clients. One of the IRS's key functions is to ensure that U.S. taxpayers pay all applicable taxes. Accordingly, the Internal Revenue Code directs the Secretary of the Treasury (the "Secretary") to "cause officers or employees of the Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax." 26 U.S.C. § 7601(a). In aid of this function, the Secretary is authorized to summon records and testimony that may be relevant or material to an investigation:

> For the purpose of ascertaining the correctness of any return, making a return where none has been made, [or] determining the liability of any person for any internal revenue tax . . . , the Secretary is authorized . . . [t]o summon . . . any person having possession,

> custody, or care of books of account containing entries relating to the business of the person liable for tax . . . , or any other person the Secretary may deem proper, to appear . . . and to produce such books, papers, records, or other data . . . as may be relevant or material to such inquiry . . . .

*Id.* § 7602(a).

Congress intended "to provide the Secretary with broad latitude to adopt enforcement techniques helpful in the performance of his tax collection and assessment responsibilities." *United States v. Euge*, 444 U.S. 707, 716 n.9 (1980). Indeed, the Supreme Court has noted that the Secretary's summons power forms the "centerpiece" of the IRS's "expansive information-gathering authority." *United States v. Arthur Young & Co*., 465 U.S. 805, 816 (1984). Because "the summons power of the IRS under the Code is quite broad, . . . courts are constrained to exercise caution before circumscribing the summons authority." *PAA Mgmt., Ltd. v. United States*, 962 F.2d 212, 216 (2d Cir. 1992); *see also Arthur Young*, 465 U.S. at 816 ("[T]he very language of § 7602 reflects . . . a congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry." *Id.* (emphasis in original).

The IRS's authority to issue "John Doe" summonses to discover the identity of unknown individuals who may have failed to report their income was recognized by the Supreme Court in *United States v. Bisceglia*, 420 U.S. 141 (1975), and later codified at 26 U.S.C. § 7609(f). This provision requires the Secretary to establish three prerequisites before serving a John Doe summons:

> Any summons . . . which does not identify the person with respect to whose liability the summons is issued may be served only after a court proceeding in which the Secretary establishes that—
>
>> (1) the summons relates to the investigation of a particular person or ascertainable group or class of persons,

(2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and

(3) the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

26 U.S.C. § 7609(f). Additionally, "[t]he Secretary shall not issue any summons . . . unless the information sought to be obtained is narrowly tailored to information that pertains to the failure (or potential failure) of the person or group or class of persons . . . to comply with one or more provisions of the internal revenue law which have been identified." *Id.* The Court's determination as to whether the IRS has met the requirements for issuance of a John Doe summons "shall be made ex parte and shall be made solely on the petition and supporting affidavits." *Id.* § 7609(h)(2).

The Secretary has established the three statutory prerequisites for the Summonses. *First*, the Summonses relate to the IRS's investigation of an ascertainable group or class of persons, namely, U.S. taxpayers who used the TT-Group's services to establish, maintain, operate, or control offshore assets, accounts, or entities from 2014 to 2023. *Second*, there is a reasonable basis for believing that U.S. taxpayers who held an interest in any such assets, accounts, or entities concealed them and related income from the IRS, thereby violating one or more provisions of the internal revenue laws. *Third*, the information sought is not readily available to the IRS from other sources. Additionally, as described below, the Summonses are appropriate because the information sought is narrowly tailored to the identity of members of the John Doe class who potentially failed to comply with the internal revenue laws.[5]

---

[5] When the Secretary seeks to issue a John Doe summons, jurisdiction lies in the district in which the person or entity to be summonsed "resides or is found." 26 U.S.C. § 7609(h)(1). A corporation

## I.    The Investigation Concerns an Ascertainable Class

The Summonses relate to an IRS investigation of an ascertainable group of people, namely, U.S. taxpayers who from 2014 to 2023 used the services of the TT-Group, including its predecessors, subsidiaries, and associates, to establish, maintain, operate, or control: any foreign financial account or other foreign asset; any foreign corporation, company, trust, foundation or other legal entity; or any foreign or domestic financial account or other asset in the name of such foreign entity. Hooczko Decl. ¶¶ 187–88.[6]

Courts have found that the "ascertainable group" requirement of Section 7609(f) is satisfied when the proposed summons specifies a particular group of taxpayers in whose potentially unlawful conduct the IRS has expressed an interest. For example, this prong was satisfied where a summons "squarely particularize[d] the individuals sought from the general public" by identifying the class as California residents who, between 2005 and 2010, were involved in certain property

---

"resides" or "is found" in a district in which it maintains a physical presence. *Mensh v. United States*, No. 08 Civ. 4162 (DLI) (ALC), 2009 WL 2242295, at *2 (E.D.N.Y. Jul. 27, 2009). Here, the proposed summons recipients all have a physical presence by virtue of at least one office within this district and/or by being headquartered in this district. *See id.*; Hooczko Decl. ¶¶ 225 (FedEx); 227 (DHL); 228 (UPS); 236 (Federal Reserve-NY); 241 (Clearing House); 259 (HSBC Bank USA); 261 (BNY Mellon); 263 (Wells Fargo); 265 (Citibank); 267 (UBS); 269 (Bank of America); 270 (Deutsche Bank); 73 (Nevis Services).

[6] Some of the summons requests use a U.S. address or phone number as indicia of an individual's status as a U.S. taxpayer. Specifically, and as discussed further below, the summons to Nevis Services requests documents related to its clients who are U.S. citizens or residents, as well as those clients who have a U.S. address or phone number. Hooczko Decl. Ex. A. Similarly, the summonses to the U.S. correspondent banks seek records of accounts held by or transactions involving TT-Group or its clients who have a U.S. address or phone number. Hooczko Decl. Exs. I–M. Likewise, the summonses to the courier entities request records of shipments between, on the one hand, a United States address, and on the other hand, TT-Group entities, individuals known to work for or on behalf of TT-Group, and addresses known to be used by TT-Group. *See* Hooczko Decl. Exs. B–D. The summonses to Federal Reserve-NY and Clearing House request all records of wire transfers involving known TT-Group entities and personnel. *See* Hooczko Decl. Exs. E–F. As discussed further below, this request targets U.S. taxpayers because those entities handle only U.S.-based or U.S.-dollar-denominated wire transfers.

transfers for little or no consideration. *See In re Tax Liabs. of John Does*, No. 2:10-mc-00130-MCE-EFB, 2011 WL 6302284, at *2 (E.D. Cal. Dec. 15, 2011). Similarly, the IRS satisfied the "ascertainable group" standard when a summons concerned U.S. taxpayers who, as agents for subsidiaries of a certain company, sold credit insurance policies reinsured by entities in the Turks and Caicos Islands. *See In re Tax Liabs. of John Does*, No. 03-22793-CIV, 2003 WL 22953182, at *1 (S.D. Fla. Oct. 30, 2003); *see also In re Tax Liabs. of John Does*, No. 09-cv-00861-REB, Dkt. No. 4 (D. Colo. Apr. 15, 2009).

Additionally, courts have repeatedly authorized the issuance of John Doe summonses whose target group comprised individuals with interests in financial accounts managed by particular entities:

- *In re Tax Liabs. of John Does (Panama Offshore Legal Servs.)*, No. 21-mc-424, Dkt. No. 19 (S.D.N.Y. July 15, 2021) (granting *ex parte* petition for leave to serve John Doe summonses in investigation of U.S. taxpayers who used the services of a particular entity, Panama Offshore Legal Services, to establish and maintain offshore accounts and entities);

- *In re Tax Liabs. of John Does (Butterfield Bank),* No. 13-mc-377-P1, Dkt. No. 3 (S.D.N.Y. Nov. 12, 2013) (granting *ex parte* petition for leave to serve John Doe summonses in investigation of U.S. taxpayers who had interests in or authority over financial accounts maintained at or managed by The Bank of N.T. Butterfield & Son Limited or other institutions that Butterfield Bank permitted to transact business through its U.S. correspondent accounts);

- *In re Tax Liabs. of John Does (Zurcher Kantonalbank (ZKB))*, No. 13-mc-378-P1, Dkt. No. 3 (S.D.N.Y. Nov. 7, 2013) (granting *ex parte* petition for leave to serve John Doe summonses in investigation of analogous group of U.S. taxpayers with interests in financial accounts related to ZKB);

- *In re Tax Liabs. of John Does (Wegelin & Co.)*, No. 13-mc-00021-P1, Dkt. No. 4 (S.D.N.Y. Jan. 29, 2013) (granting *ex parte* petition for leave to serve John Doe summonses in investigation of analogous group of U.S. taxpayers with interests in financial accounts related to Wegelin & Co., including accounts at financial institutions that Wegelin permitted to transact client business through its U.S. correspondent account).

Here, the relevant class of U.S. taxpayers are particularized from the general public because the class is limited to U.S. taxpayers who used the TT-Group's services to establish and maintain foreign accounts and entities during certain years. The investigation underlying the Summonses thus relates to an "ascertainable group or class of persons." 26 U.S.C. § 7609(f)(1).

## II.    There Is a Reasonable Basis to Believe that the John Doe Class May Have Failed to Comply with U.S. Internal Revenue Laws

The IRS has a reasonable basis to believe that the U.S. taxpayers who used the TT-Group's services during the relevant period may have failed to comply with the internal revenue laws. To satisfy the "reasonable basis" requirement, the IRS need only show that a transaction has occurred that is "of such a nature as to be reasonabl[y] suggestive of the possibility that the correct tax liability with respect to that transaction may not have been reported." H.R. Rep. No. 94-658, at 311 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3208.

In enacting Section 7609(f), Congress did "not intend to impose an undue burden on the [IRS] in connection with obtaining a court authorization to serve this type of summons." H.R. Rep. No. 94-658, at 311, *reprinted in* 1976 U.S.C.C.A.N. at 3207. Rather, Congress sought to ensure that the IRS would have "a specific situation to present in the court," instead of using the summonses to engage in a "possible 'fishing expedition.'" *Id.*; *see also Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 320–21 (1985) (§ 7609(f) was enacted out of congressional concern that summons authority could be used to engage in "fishing expeditions" (citing H.R. Rep. No. 94-658, at 307, 311 and S. Rep. No. 94-938, at 368–69, 373)); *In re Tax Liabs. of John Does (Agric. Asset Mgmt. Co.)*, 688 F.2d 144, 149 (2d Cir. 1982) (Section 7609(f) was "concerned only with . . . preclud[ing] the IRS from using [John Doe] summonses to engage in possible 'fishing expeditions.'" (quoting H.R. Rep. No. 94-658, at 311)). Courts, therefore, have concluded that "Congress did not intend to impose stringent restrictions on the [IRS]'s investigatory function,"

19

but rather, that the intent was "to prevent the [IRS] from exercising its summons power in an arbitrary or quixotic manner." *In re Tax Liabs. of John Does (Columbus Trade Exch.)*, 671 F.2d 977, 979–80 (6th Cir. 1982).

Here, the evidence that the IRS has obtained to date shows that the TT-Group offers services to U.S. taxpayers that, in the IRS's experience, bear the hallmarks of enabling offshore tax evasion, such as the establishment of offshore structures, including offshore foundations and anonymous corporations; the use of nominee officers and directors; undisclosed ownership through bearer shares; mail forwarding; and the concealment of beneficial ownership in foreign accounts and other foreign assets in foreign jurisdictions with strong financial secrecy laws and practices. *See, e.g.*, Hooczko Decl. ¶¶ 84–131. In the IRS's experience, offshore tax avoidance almost always involves such accounts and offshore structures. *Id.* ¶ 34. The TT-Group also advertises these services and specifically describes them as means to provide clients the ability to keep beneficial ownership information confidential and avoid public reporting, with express references to "suitable solutions" for "tax and estate planning." *Id.* ¶¶ 85, 109, 121. Thus, the IRS has reason to believe that currently unidentified U.S. taxpayers have used the TT-Group's services to facilitate noncompliance with the internal revenue laws. *Id.* ¶ 84.

This satisfies the "reasonable basis" requirement of Section 7609(f). Courts have found that this prong is met if the IRS knows of similar past transactions associated with taxpayers failing to comply with the internal revenue laws. *See Columbus Trade Exchange*, 671 F.2d at 980 (IRS had a reasonable basis to investigate tax returns of members of a barter exchange based on fact that, in IRS's experience, members of other barter exchanges historically exhibited numerous reporting errors in reporting non-cash transactions on their tax returns); *United States v. Pittsburgh Trade Exch., Inc.*, 644 F.2d 302, 306 (3d Cir. 1981) (IRS agent's testimony that transactions of the

type the summonsed party arranged for its clients were "inherently susceptible . . . to tax error" was sufficient to meet the "reasonable basis" prong); *see also United States v. Ritchie*, 15 F.3d 592, 601 (6th Cir. 1994) (clients' payment for legal services with large amounts of cash provided a reasonable basis to issue a John Doe summons).

Likewise, here, the IRS believes—based on its experience and the evidence developed to date—that U.S. taxpayers have used the TT-Group's services to evade U.S. reporting requirements and payment of U.S. income taxes. This informed belief provides the IRS with a reasonable basis to believe that the John Doe class of U.S. taxpayers whose information it now seeks to summon "may fail or may have failed to comply with any internal revenue law." 26 U.S.C. § 7609(f).

### III. The Information Sought About the Target Class, Including the Identities of the Class's Members, Is Not Readily Available from Other Sources

The information the IRS is seeking through the Summonses is not readily available from other sources. To the contrary, the very need for the John Doe summonses arises because U.S. clients of the TT-Group may have failed to disclose their foreign bank accounts, assets, and entities to the IRS and, therefore, remain unknown to the IRS. *See In re Tax Liabs. of John Does (Am. Bankers Ins. Group)*, No. 03-cv-22793, 2003 WL 22953182 (S.D. Fla. Oct. 30, 2003), at *1 (granting a petition for a John Doe summons on the ground that the IRS needed information from the recipient of the summons to continue its investigation of a class of taxpayers violating the internal revenue laws).

Courts have approved the issuance of John Doe summonses and held that the identities of the persons to be investigated are not "readily available," in cases where the identities were presumably in the hands of foreign institutions. *See, e.g.*, *In re Tax Liabs. of John Does (American Express)*, No. 00-cv-3919, 2000 WL 34538137, at *1 (S.D. Fla. Oct. 30, 2000) (authorizing service of John Doe summonses seeking the identity of U.S. taxpayers who used American Express and

MasterCard accounts tied to certain Caribbean banks); *see also In re Tax Liabs. of John Does (MasterCard Int'l)*, No. 02-22404-CIV, 2002 WL 32879613, at *1 (S.D. Fla. Aug. 20, 2002) (authorizing service of a John Doe summons seeking the identity of U.S. taxpayers who held certain credit card accounts with ties to foreign banks); *In re Tax Liabs. of John Does (HSBC Bank USA, N.A.)*, No. 11-cv-01686-PJH, Dkt. No. 10 (N.D. Cal. Apr. 7, 2011) (authorizing the issuance of a John Doe summons on HSBC seeking financial account records establishing the identities of U.S. taxpayers with interests in or signature or other authority with respect to HSBC's Indian bank accounts).

In particular, this Court has repeatedly authorized the issuance of John Doe summonses seeking the identity of U.S. taxpayers with direct or indirect interests in foreign financial accounts. *See Panama Offshore Legal Servs.*, No. 21-mc-424, Dkt. No. 19 (granting *ex parte* petition for leave to serve John Doe summonses in investigation of U.S. taxpayers who used the services of a particular entity, Panama Offshore Legal Services, to establish and maintain offshore accounts and entities); *Butterfield Bank*, No. 13-mc-377-P1, Dkt. No. 3 (granting *ex parte* petition for leave to serve John Doe summonses in investigation of U.S. taxpayers who had interests in or authority over financial accounts maintained at or managed by The Bank of N.T. Butterfield & Son or other institutions that Butterfield Bank permitted to transact business through its U.S. correspondent accounts); *ZKB*, No. 13-mc-378-P1, Dkt. No. 3 (granting *ex parte* petition for leave to serve John Doe summonses in investigation of U.S. taxpayers with interests in financial accounts related to Zurcher Kantonalbank); *Wegelin*, No. 13-mc-00021-P1, Dkt. No. 4 (granting *ex parte* petition for leave to serve John Doe summonses in investigation of U.S. taxpayers with interests in financial accounts related to Wegelin & Co., including accounts at financial institutions that Wegelin & Co. permitted to transact client business through its U.S. correspondent account).

Here, the IRS currently cannot independently identify the members of the target class; in fact, the purpose of the Summonses is to discover the class members' identities. As described above and in the Hooczko Declaration, the TT-Group offers services U.S. taxpayers, including individuals and trusts, may use to establish and maintain offshore entities and structures, including offshore bank accounts, and to conceal their ownership of other foreign assets, including for U.S. taxpayers. *See* Hooczko Decl. ¶¶ 84–131. Thus, the information the IRS seeks in the Summonses is not readily available to it from other sources, if at all. *See* 26 U.S.C. § 7609(f)(3).

## IV. The Information Sought Is Narrowly Tailored to Information that Pertains to the Failure or Potential Failure of the John Doe Class to Comply with the Internal Revenue Laws

For the reasons described above and in the Hooczko Declaration, the three statutory prerequisites for issuance of the Summonses are present here. 26 U.S.C. § 7609(f)(1)–(3). Additionally, the items requested by the Summonses are narrowly tailored to assist the IRS in identifying the unknown members of the John Doe class and investigating their failure, or potential failure, to comply with the internal revenue laws—specifically their obligation to file U.S. income tax returns reporting their worldwide income from all sources and to disclose their ownership of certain foreign assets to the Government. *Id.* § 7609(f).

The requirement that a John Doe summons be "narrowly tailored to information that pertains to the failure (or potential failure) of the [John Doe class] to comply with one or more provisions of the internal revenue law" was added, as discussed above, to ensure that "the information sought in the summons [is] at least potentially relevant to the tax liability of an ascertainable group," and that the summons is not used "for the purposes of a fishing expedition." H.R. Rep No. 116-39, at 41 (2019). The provision "is not intended to change the *Powell* standard [i.e., the showing the IRS must make in support of summons enforcement] or otherwise affect the

IRS's burden of proof."[7] *Id.* at 42; *accord* U.S. Congress, Joint Committee on Taxation, *Description of H.R. 1957, the "Taxpayer First Act of 2019,"* at 15 (2019), https://www.jct.gov/publications/2019/jcx-15-19/.

Those standards are satisfied here. *First*, the summonses to FedEx, DHL, and UPS seek only information about shipments between, on the one hand, a United States address, and on the other hand, TT-Group entities, individuals known to work for or on behalf of TT-Group, and addresses known to be used by TT-Group. *See* Hooczko Decl. Exs. B–D. As discussed above, the websites of TT-Group entities encourage clients to use couriers for shipments. *See, e.g.*, *id.* ¶ 230. Further, because these couriers can search their records based on the sender's or recipient's address, they should be able to identify instances when their services were used to ship documents to and from TT-Group associates where the address of either the shipper or recipient was in the United States. *Id.* ¶¶ 231. This will assist the IRS in identifying U.S. clients of the TT-Group who are members of the John Doe class. *Id.* ¶ 233.

*Second*, the summonses to Federal Reserve NY, which operates the Fedwire system, and Clearing House, which operates CHIPS, seek records that the IRS anticipates will reflect electronic funds transfers relating to U.S. clients of the TT-Group. *See id.* Exs. E–F. As noted above, the TT-Group advertises that it accepts payment by wire transfer. *Id.* ¶¶ 238, 242. The summonses seek records of any wire transfers sent via Fedwire or CHIPS for which a TT-Group entity, person, or address appears in any of the originator, beneficiary, instruction, or reference fields. *Id.* Because

---

[7] Where the Government seeks to enforce any IRS summons, it must establish "[1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's possession, and [4] that the administrative steps required by the Code have been followed[.]" *United States v. Powell*, 379 U.S. 48, 57-58 (1964). The Government's burden of showing such compliance is "minimal." *United States v. White*, 853 F.2d 107, 111 (2d Cir. 1988); *United States v. Davey*, 543 F.3d 996, 1000 (2d Cir. 1976).

Fedwire and CHIPS handle only U.S.-based or U.S.-dollar-denominated transfers, records of wire transfers sent over these services involving the TT-Group will assist the IRS in identifying U.S. taxpayers who may have used the TT-Group's services for tax avoidance. *Id.* ¶¶ 238, 240, 242, 244. The IRS further expects that these records may reveal the identities of banks used by the TT-Group other than those already known to the IRS, which in turn may assist the IRS in identifying additional unreported taxable income. *Id.*

*Third*, the summonses to the U.S. Correspondent Banks seek bank records for correspondent accounts of foreign banks used by the TT-Group that are material and relevant to the IRS's investigation. *Id.* Exs. G–M. This includes specific correspondent accounts that the IRS knows have been used by the TT-Group, as well as other correspondent accounts of foreign banks that are used by the TT-Group. *See, e.g.*, *id.* ¶¶ 122–30, 257. As discussed above, correspondent banks are used by domestic owners of offshore accounts to access those accounts remotely, and to facilitate the transfer of U.S. dollar-denominated funds. *Id.* ¶¶ 56, 246. The IRS expects the correspondent account records to identify U.S. clients of the TT-Group and to reflect information about those clients' use of foreign entities to conceal assets. *Id.* ¶ 248. For example, records of deposits should contain evidence of payments to the TT-Group from its U.S. clients, and cancelled checks may reflect evidence of payments made by the TT-Group either to its U.S. clients or on their behalf. *Id.* ¶ 249–50. The correspondent account records should also include the names, addresses, and financial account numbers of members of the John Doe class. *Id.* ¶ 250. Additionally, the anti-money laundering records requested from the summonsed correspondent

banks may reveal aliases, pseudonyms, or nominees of U.S. taxpayers who have used the TT-Group's services to facilitate U.S. tax evasion. *Id.* ¶ 251–54.[8]

*Fourth*, the summons to Nevis Services is squarely targeted at obtaining records that will help the IRS identify U.S. persons who used this TT-Group affiliate to establish, maintain, operate, or control offshore structures and financial accounts of TT-Group's U.S. clients. *See* Ex. A. The information sought consists of (1) client identity information such as client questionnaires, Know Your Customer files, client account opening forms, and entity formation documents; (2) transaction information such as documents reflecting U.S. client activity, documents reflecting asset transfers to foreign entities, invoices billed to clients, and billing information captured from online payments; and (3) beneficial ownership information such as Know Your Customer files, account signature cards, powers of attorney, communications involving entity and account establishment, entity formation documents, and client information forms and questionnaires. *Id.* ¶ 201–19. The requests for client identity information are directed at adequately identifying John Doe class members so that transactional and account data can reasonably be associated with particular persons. *See id.* ¶¶ 201–08. Transaction information requests are directed at adequately identifying whether taxable events took place. *See id.* ¶¶ 209–13. And beneficial ownership and control information requests are directed at adequately identifying the true beneficial owners (usually the persons who also have ultimate control over the assets) in the face of various mechanisms designed to conceal this information. *See id.* ¶¶ 214–19.

Moreover, Nevis Services is likely to have information responsive to these narrowly tailored requests. Information available to the IRS indicates that the TT-Group and its entities,

---

[8] The summonses to the banks are not duplicative of the summonses to Federal Reserve NY and Clearing House because the correspondent accounts will have records of fund transfers that did not go through either the Fedwire or the CHIPS systems. *Id.* ¶ 250.

including the domestic entities, collect information about their clients. *Id.* ¶¶ 75–76. This information includes the identity of TT-Group clients, which will help the IRS identify U.S. taxpayers who may fail or have failed to comply with U.S. tax laws. *Id.* This information is not readily available from other sources. *Id.* ¶ 134, 197. Nevis Services is also likely to have the transaction information the IRS requests in the summonses—the IRS knows from the TT-Group's public websites that its entities keep track of payments they receive for each client and generate invoices for these payments. *Id.* ¶ 131, 222. This confidential billing information will not be readily available from sources outside the TT-Group and its affiliates. Further, Nevis Services records will contain valuable information about the beneficial ownership and control of foreign entities established for U.S. taxpayers. Not only do the TT-Group and its affiliates keep record of the beneficial ownership of assets in its client files, *id.* ¶ 76, but they also require clients submitting payment for services to list the offshore entity relating to their payment, *id.* ¶ 131. Because of the secretive nature of offshore entities, the information regarding beneficial ownership and control that Nevis Services possesses will not be readily available from other sources.

Thus, each of the items sought by the Summonses is narrowly tailored to obtaining information that may further the IRS's investigation of the John Doe class and its members' failure or potential failure to comply with the internal revenue laws.

**CONCLUSION**

For the foregoing reasons, the Court should grant Government's *ex parte* petition to issue

the Summonses.

Dated: New York, New York
        December 17, 2024

                                            EDWARD Y. KIM
                                            Acting United States Attorney
                                            Southern District of New York

By:    s/ Anthony J. Sun
                                              ANTHONY J. SUN
                                            Assistant United States Attorney
                                            86 Chambers Street, 3rd Floor
                                            New York, New York 10007
                                            Telephone: 212-637-2810
                                            Email: anthony.sun@usdoj.gov

                                            *Attorney for the United States of America*